IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JAMES E. McCOY, | ) | |
|     Plaintiff | ) | |
| | ) | |
| vs. | ) | Civil Action No. 07-515 |
| | ) | Judge Nora Barry Fischer/ |
| PRISON HEALTH SERVICES; DR. R. | ) | Magistrate Judge Amy Reynolds Hay |
| McGRAPH, Physician at S.C.I. Somerset; | ) | |
| E. SIMKINS, Physicians Assistant at S.C.I. | ) | |
| Somerset; Individually and in their Official | ) | |
| capacities, | ) | Re Dkt. [108] |
|     Defendants | ) | |

REPORT AND RECOMMENDATION

I.    Recommendation

It is respectfully recommended that the Medical Defendants' Motion for Summary Judgment, Dkt. [108], be granted

II.    Report

This case has been the subject of a prior report and recommendation, Dkt. [97], familiarity therewith is presumed. As a result of the prior proceedings, all claims against all defendants have been dismissed except for an Eighth Amendment deliberate indifference claim against Dr. R. McGraph, the Medical Director at SCI-Somerset, E. Simkins, a Physician's Assistant there and Prison Health Services, the independent contractor providing health care services there (collectively, "the Medical Defendants" or "the Defendants").

The case boils down to a claim that the Medical Defendants prescribed Plaintiff oral medications to treat diabetes when, allegedly, no tests were performed in order to ascertain

whether Plaintiff, in fact, had diabetes and these medications had bad side effects, causing Plaintiff nerve damage. In addition, Plaintiff was taking another medication called Seroquel, also known generically as Quetiapine, which causes high blood glucose levels, which is an indication of, if not the very definition of, diabetes. See, e.g., Dkt. [66] at 2, ¶4. ("The Plaintiff avers the defendants, Dr. McGraph, and Ms. Simkins, has [sic] acted in a malicious manner in treating the plaintiff for an alleged condition. On 11/15/04, [in point of fact, it was December 14, 2005[1]] the plaintiff was transferred to S.C.I. Sommerset [sic]. Upon arrival the plaintiff was prescribed Glibizied (5mg.) tablets, orally, twice daily. No test had ever been performed or ordered for such diagnoses [sic] to be claimed, further the plaintiff was taking an anti-depressant in which gives high sugar level readings, making a diagnoses [sic] of diabetes next to impossible to be determined.").

The Medical Defendants filed a motion for summary judgement, Dkt. [108], a brief in support, Dkt. [109], a concise statement of material facts, Dkt. [110], and an appendix of evidentiary materials, including affidavits from Dr. McGraph and Defendant Simkins and Plaintiff's medical records, Dkt. [111]. After Plaintiff was granted a motion for extension of time in which to file his response, Plaintiff filed a response, Dkt. [118], a filing entitled Plaintiff's "motion to Deny Defendant's Motion for Summary Judgment," Dkt. [119], a response to the Defendants' Statement of material facts, Dkt. [120], a statement of disputed factual issues, Dkt. [121], and a brief in opposition, Dkt. [122]. Defendants filed a reply brief. Dkt. [127]. The Court entered an order denying, without prejudice Plaintiff's motion to deny Defendants' motion for summary judgment. Dkt. [123]. In Dkt. [119], Plaintiff essentially sought, pursuant

---

[1] Dkt. [109] at 2 to 3, n. 3.

to Fed.R.Civ.P. 56(f), to postpone the court's ruling on the Defendants' Summary Judgment motion because Plaintiff contended that he did not have all of the discovery completed yet in order to support his case against PHS. See Dkt. [119] at 1, ¶ 3. See also Dkt. [136] at 3 ("Plaintiff has not been able to complete discovery which he will need to substantiate his claim(s) against P.H.S.")(underlining removed). However, he failed to attach an affidavit thereto as is required by the Rule, hence the Court denied the motion without prejudice to filing with the required affidavit. Dkt. [123]. Subsequently, Plaintiff filed a new motion to deny the Defendants' Motion for Summary judgment, but this time accompanied by the necessary affidavit. Dkt. [132]. Plaintiff also re-filed a Response to the Defendants' Concise Statement, Dkt. [133], and a Statement of Disputed Factual Issues, Dkt. [134], a Declaration, Dkt. [135] and a Brief in opposition, with evidentiary materials attached, Dkt. [136]. The Court denied Plaintiff's motion to deny the Defendants' motion for summary judgment, i.e., Dkt [132], essentially a motion to delay ruling on the Summary Judgment motion, because, according to Plaintiff, he had to conduct more discovery. Dkt. [139]. The Court did so because Plaintiff failed to explain what further discovery he needed to conduct.

The Defendants' motion for summary judgment should be granted because Plaintiff fails to carry his burden to show that the real person Defendants violated his Eighth Amendment rights because he failed to adduce evidence of the subjective prong, as is his burden. Given that he failed to establish an Eighth Amendment claim as to the real person Defendants, he failed to establish that any policy on the part of PHS actually caused him any such non-existent constitutional violation.

A. Summary Judgment Standard

Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317 (1986). The moving party bears the initial burden to show or point out why there is no genuine issue of material fact. Walters ex rel. Walters v. General Motors Corp., 209 F.Supp.2d 481, 484 (W.D. Pa. 2002). Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a *genuine issue for trial* . . ." or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986). "Where the record taken as a whole could not lead a reasonable trier of fact to find for the non-moving party, there is no genuine issue for trial." Matsushita, 475 U.S. at 587. The inquiry involves determining whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law. Brown v. Grabowski, 922 F.2d 1097, 1111 (3d Cir. 1990). If a court, having reviewed the evidence with this standard in mind, concludes that "the evidence is merely colorable . . . or is not significantly probative," then summary judgment may be granted. Anderson, 477 U.S. at 249-50. Moreover, it is not enough for the nonmovant to show that there is some dispute as to facts, rather, "only disputes over facts that might affect the outcome of the suit will prevent summary judgment." Anderson, 477 U.S. at 248.

In short, the summary judgment motion is an evidence testing device to see if there is

4

sufficient evidence to support a party's position with respect to an issue for which that party bears the burden of proof at trial so as to justify holding a trial. Summary judgment is the "moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." Albiero v. City of Kankakee, 246 F.3d 927, 933 (7th Cir. 2001).

    B.  Discussion

The Eighth Amendment provides that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."[2] The Supreme Court has explained that analysis of a violation of the Eighth Amendment involves a two pronged inquiry: 1) an objective inquiry into the qualitative nature of the harm suffered by the victim of the alleged punishment and 2) a "subjective inquiry" into the mind of the person inflicting the harm. Wilson v. Seiter, 501 U.S. 294 (1991). Accord Sims v. Artuz, 230 F.3d 14, 21 (2d Cir. 2000). As to the subjective component, in cases involving medical care, such as the present one, the Supreme Court has held that "deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain ... proscribed by the Eighth Amendment." Estelle v. Gamble, 429 U.S. 97, 104 (1976) (internal quotations omitted). The Court has held that "deliberate indifference" occurs when a prison "official knows of and

---

[2] Technically, the Eighth Amendment applies to the states through the Fourteenth Amendment. See Estelle v. Gamble, 429 U.S. 97, 101-02 (1976) (citing Robinson v. California, 370 U.S. 660 (1962)). The standards of the Eighth Amendment barring the federal government from inflicting cruel and unusual punishments are the standards applicable to the States through incorporation by the Fourteenth Amendment's substantive due process clause. See Sistrunk v. Lyons, 646 F.2d 64, 66-67 (3d Cir. 1981)(citing Robinson v. California). The standards under the Eighth Amendment and the standards under the Fourteenth Amendment are fundamentally identical. Furman v. Georgia, 408 U.S. 238, 422 n.4 (1972)(Blackmun, J., dissenting) ("the tests for applying these two provisions are fundamentally identical."). Given this, the court will not separately analyze the Eighth and Fourteenth Amendments. Rather, the court will analyze Plaintiff's claims utilizing the standards of the Eighth Amendment and cases ostensibly construing those standards.

disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and he must also draw the inference." Farmer v. Brennan, 511 U.S. 825, 837 (1994). As a corollary of the deliberate indifference standard, mere negligence by staff at the prison, medical personnel and physicians in treating prisoners is not sufficient to state an Eighth Amendment violation. Estelle, 429 U.S. at 105-06. The Supreme Court has held that

> in the medical context, an inadvertent failure to provide adequate medical care cannot be said to constitute "an unnecessary and wanton infliction of pain" or to be "repugnant to the conscience of mankind." Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner. In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs. It is only such indifference that can offend "evolving standards of decency" in violation of the Eighth Amendment.

Id. Plaintiff bears the burden to prove, by competent evidence, both the subjective and the objective components of the Eighth Amendment claim. Newland v. Achute, 932 F.Supp. 529, 532 (S.D.N.Y., 1996) ("The plaintiff's burden in proving an Eighth Amendment violation consists of both an objective and subjective element."); Pasha v. Barry, No. Civ. A. 96-466, 1996 WL 365408, at *1 (D.D.C. June 21, 1996)("the plaintiff bears the burden of demonstrating that his claims satisfy both the objective and subjective requirements of a claim of 'cruel and unusual punishment.'").

In support of their summary judgment motion, the Defendants have filed two affidavits, one from Dr. McGraph, Dkt. [111-2], at 17-23, and one from Defendant Simkins, Dkt. [111-11] at 17 to 20. Those affidavits indicated that upon arrival at SCI-Somerset, where Dr. McGraph

6

and Physician Assistant Simkins worked at the time, Plaintiff arrived with a pre-existing diagnosis of non-insulin dependent diabetes mellitus or "NIDDM" and that they ordered him to be continued on the medication he had been receiving for NIDDM, as well as diagnostic tests for NIDDM.

In the affidavit, Dr. McGraph explained, by way of background, the following:

> Non-insulin-dependent diabetes mellitus (NIDDM) or type 2 diabetes is a metabolic disorder where diet, exercise, and medications are needed to control the appropriate level of glucose in the blood. In patients with NIDDM blood glucose levels vacillate with diet and exercise and must be monitored. Fasting blood glucose tests are used to measure the level of sugar in the blood stream at any one time. Finger stick blood tests are also used for quick checks of glucose levels. The hemoglobin A1c (Hgb A1c) test is an important diagnostic tool used by doctors to evaluate patients. It measures the average blood sugar over the last three months and gives doctors the best indicator of how a patient is doing overall. An Hgb A1c test is a standard test for patients with diabetes. The normal range is 4.0-5.9%. In poorly controlled diabetes, it is 8.0% or above. In patients with managed diabetes, it can be less than 7.0%. The benefits of measuring Hgb A1c is that it gives a more reasonable view of what is happening with the patient over approximately three months.

Dkt. [111-2] at 18, ¶ 4

Dr. McGraph then attested to the following concerning Plaintiff specifically:

> The medical records show that Mr. McCoy came to Somerset with a medical history of NIDDM. He was admitted to the facility on prescriptions to control and stabilize his diabetes. When an inmate arrives at our facility with a history of certain medical conditions, it is our protocol to continue medications prescribed and to confirm such diagnosis within a reasonable time with appropriate testing. Such protocol was followed with Mr. McCoy.
> The medical records show that Mr. McCoy was admitted to Somerset in December, 2004. An intake interview of Mr. McCoy was taken on December 16, 2004. At that time, Mr. McCoy's medical history was reviewed, showing that he had been diagnosed several years ago as a non-insulin-dependent-diabetic (NIDDM). His medical records showed that recent blood glucose tests were performed in September and October of 2004 and he was stable on Glucotrol. His last Hgb A1c test showed a result of 6.8%. My review of Mr. McCoy's medical history prior to his transfer to Somerset shows that he was properly diagnosed

> with NIDDM based on a variety of Hgb A1c results. The notes for the intake review did not show that McCoy raised any concern or objection to the diagnosis. Nothing in his medical file would suggest that he had been misdiagnosed. Mr. McCoy's Glucotrol was reordered and he was scheduled to be seen in the diabetes clinic on a regular basis.
>
> In the normal course of care, Mr. McCoy would have been monitored in the Diabetes clinic at Somerset and have had his medications adjusted based on testing. However, in January of 2006, he was seen for chest pains. His fasting glucose was at 180 and a few days later it was even higher so he was monitored closely.

Dkt. [111-2] at 18 to 19, ¶¶ 5 to 7( paragraph numbers omitted). See also Dkt. [111-11] at 19 to 20 (recounting P.A. Simkins encounter with Plaintiff on February 9, 2007, wherein she attests that she did not refuse Plaintiff a blood glucose test as alleged by Plaintiff as revealed by the medical records because she has no independent recollection of seeing Plaintiff). We note that attached to the affidavits were Plaintiff's medical records, which confirm what the two Defendants attested to in their affidavits.

These affidavits and the medical records were sufficient to show an absence of evidence in the record to support Plaintiff's Eighth Amendment deliberate indifference claim and, therefore, to shift the burden to Plaintiff to come forward with evidence to support both the subjective and objective prongs of his Eighth Amendment claim.

In an effort to meet this burden, Plaintiff filed various evidentiary materials. Those materials included "Plaintiff's first affidavit in Opposition to Defendants' motion for summary judgment." Dkt. [132-2] at 1 to 4. In that affidavit, Plaintiff attests that "[t]here is no 'progress notes" or test of confirmation that Mr. McCoy was diagnosed or treated for diabetes, there is no medical history of NIDDM of Mr. McCoy prior to coming to Somerset, as Dr. McGraph states." Dkt. [132-2] at 1 to 2, ¶ 4. Plaintiff further contended that he was on Seroquel, a psychiatric drug

8

that Plaintiff contends is for treatment of his "depression," from 1999 and that one of the side effects of Seroquel is elevated blood glucose levels. Dkt. [132-2] at 2, ¶¶ 5 to 6.[3] Plaintiff argues that he was not truly diabetic and that his elevated blood glucose levels were caused by his Seroquel and that contrary to Dr. McGraph's affidavit, Plaintiff was never given **fasting** blood tests, even though he was given blood tests. Dkt. [122] at 3.

First, we note that Plaintiff's averment that there is no progress note or test of confirmation or medical history of NIDDM for Mr. McCoy prior to coming to Somerset as Dr. McGraph states is contradicted by Plaintiff's medical records. Progress Notes from "12/11/04" some three days prior to his arrival at SCI-Somerset, he was described as "diabetic." Dkt. [111-2] (second line of progress note). See also Dkt. [111-4] at 6 (second line of progress note) (Progress Note dated "9/18/04" describing Plaintiff as "Hx NIDDM" which the court takes to mean "history of NIDDM"). See id., Progress Note dated 9/8/04 (at the line for "A" meaning the medical practitioner's "assessment" there is the notation "NIDDM").

Thus, contrary to Plaintiff's averment, and, consistent with Dr. McGraph's affidavit, Plaintiff's medical progress notes or medical history prior to coming to SCI-Somerset, most certainly do indicate a diagnosis of NIDDM.

In addition, the extensive objective medical testings show that Plaintiff's Hgb A1c levels were repeatedly in the level above 6.0%, indicating diabetes although, at many times the test showed a level between 6.0% and 7.0%, indicating, not that Plaintiff did not have diabetes but that it was being controlled adequately. Dkt. [111-2] at 18, ¶ 4 (Dr. McGraph's affidavit,

---

[3] To the extent that Dkt. [132-2] illegible in part, it is merely a duplicate of Dkt. [118] at 1 to 5, except for the fact that Dkt. [118] was executed on 12/10/08 and Dkt. [132-2] was executed on 12/26/08 and with a notarial seal.

indicating the significance of the test ranges, which is confirmed by the test results themselves that provide the standards, i.e., the test results indicate, for example, " < 6.0% Non-Diabetic[;] < 7.0% Diabetic Control[;] >8.0% Additional action suggested" Dkt. [118-2] at 18). See also, e.g., Dkt. [111-2] at 26 (Hgb A1c test of 9/23/04, indicating a level of 6.8, which is a test performed prior to Plaintiff being transferred to SCI-Somerset). Indeed, evidence that Plaintiff himself proffers shows Hgb A1c results of 7.8% in a test occurring on June 6, 2005, Dkt. [118-2] at 9; and another test, occurring March 21, 2006, Dkt. [118-2] at 15, and, in yet another test, occurring on August 24, 2006, where both times, the result is 6.3%. Dkt. [118-2] at 18. See also Dkt. [118-2] at 20 (showing a result of 6.5 in a test taken 2/15/07); id., at 21 (showing a result of 6.6 in a test taken on 3/16/07); id., at 23 (showing a result of 6.5 in a test taken on 4/16/07).

Plaintiff also complains that his blood tests were not conducted after he engaged in fasting. See e.g., Dkt. [118] at 2, ¶ 7 (citing an exhibit that indicated his Hgb A1c level was 7.8% while Plaintiff was "on 400mg. of Seroquel when test were [sic] done without blood fasting."). See also id., at ¶ 6 ("In January 2006 plaintiff was taking 200 mg. of Seroguel [sic] explaining any high glucose levels[,] further plaintiff has never fasted for blood work prior to 5-15-06 since plaintiff was on 'Seroquel'."). Although not necessary to the recommended disposition of this case, the Court notes that it is not necessary to fast before taking an Hgb A1c test.[4] For purposes of this summary judgment motion, we may assume, as Plaintiff seems to

---

[4] See, e.g.,

http://www.bmhcc.org/health/health_library/dhd3924f.asp

wherein the website notes the following regarding an Hgb A1c test:

How do I prepare for this test?

suggest, albeit without any medical evidence to support him, that it is necessary to fast prior to taking the Hgb A1c test, however, even doing so does not preclude summary judgment for the defendants because there is absolutely no evidence that either of the two real person defendants knew that Plaintiff did not fast prior to taking the test and there is absolutely no evidence that PHS had any policy of not requiring Plaintiff to fast prior to taking the test. The absence of any such evidence redounds to Plaintiff's detriment as it is his burden to produce evidence of the subjective prong and on this record there is none.

The only argument Plaintiff repeatedly makes is that the Defendants knew or should have known that he was not actually diabetic and that his elevated blood glucose levels were in fact caused by his taking of the Seroquel. <u>See</u>, <u>e.g.</u>, Dkt. [120] at 4, ¶ 16 ("the defendant known [sic]

---

> No preparation is necessary. One of the advantages of this test is that you do not have to fast before you take it.

(Site last visited 5/22/09);

<u>See</u> <u>also</u>

http://www.endo-society.org/media/press/2008/News-Briefs-May-2008.cfm

wherein the website observes the following

> As an alternative to the fasting plasma glucose or oral glucose tolerance tests, the panel suggested incorporating another measurement of glucose, hemoglobin A1c (HbA1c), into criteria for screening and diagnosing diabetes.
>
> . . . .
>
> The measurement of HbA1c does not require fasting, while current accepted tests require the patient to fast for at least eight hours. Furthermore, HbA1c more accurately reflects longer-term glucose concentration in the blood; other tests can easily be affected by short-term lifestyle changes, such as a few days of dieting or exercise. And finally, HbA1c laboratory methods are now well standardized and reliable.

(Site last visited 5/22/09).

11

or should have known of the serious harms they were doing to plaintiff."); Dkt. [121] at 1, ¶ 2 (listing as one of the disputed factual issues "Whether the defendants known [sic] or should have known plaintiff was taking Seroquel at the times they determined plaintiff was a diabetic."). First, there is absolutely no evidence that Plaintiff was not, in fact, diabetic. There is no evidence, let alone medical evidence to show that even if Seroquel induces diabetes, that such diabetes should not be treated with glucose lowering drugs.[5] Even if there were evidence in this record indicating that Plaintiff in fact did not have diabetes or that the "diabetes" which he did have, as indicated by the elevated blood glucose levels repeatedly evidenced by the Hgb Ac1 tests, occurring over a span of years, was caused by Seroquel, that the Defendants knew that Plaintiff's diabetes was so caused by the Seroquel and/or even if they had known of such, that it was inappropriate to treat the elevated blood glucose levels with the diabetes drugs that Plaintiff was prescribed. Given that there is no evidence that the defendants actually knew of such, Plaintiff's only remaining argument is that they should have known of such. However, as is clear, such a "should have known" standard is not the "deliberate indifference" standard required under the Eighth Amendment but is merely a negligence standard, more appropriate for a state tort action and absolutely falling short of any constitutionally cognizable claim. See e.g., Farmer v. Brennan, 511 U.S. at 860 (Thomas, J. concurring)("Petitioner's suggested 'should have

---

[5] Of course, the retort is that if Seroquel induces diabetes, then some other drug should have been used that does not induce diabetes. The answer to this is that whatever cost benefit calculation regarding the benefit to Plaintiff of treating him with the psychiatric drug as opposed to the detriment of not treating him with Seroquel or treating him with a different drug, there is simply no evidence that such cost benefit analysis was anything other than a medical judgment entitled to deference in the absence of medical opinion to the contrary (and there is none on this record) and certainly does not evidence deliberate indifference even if Plaintiff could adduce medical opinion that calculated the cost benefits analysis differently from the Defendants. Johnson v. Phelan, 69 F.3d 144, 150 (7th Cir. 1995)("An incorrect assessment of recognized costs and benefits is just negligence, which does not violate the fifth amendment . . . and does not violate the eighth amendment either.").

known' standard is nothing but a negligence standard"). There is simply no evidence to establish that the two real person defendants were "both . . . aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and [that they] . . . also dr[e]w the inference." Farmer v. Brennan, 511 U.S. at 837 (1994). In other words, even viewing the summary judgment record in a light most favorable to the Plaintiff, and concluding that he was not truly a diabetic and that his elevated blood glucose levels were caused solely by his taking Seroquel, in light of the fact that the tests all confirmed that Plaintiff had such elevated blood glucose levels, the indicator of diabetes, and that the Defendants attempted to treat such with diabetes controlling drugs, which, we assume for the present purposes, were the cause of Plaintiff various symptoms, the record discloses nothing more than, at most, negligence and no reasonable jury, could, on the basis of this record, find an Eighth Amendment violation against either of the real person Defendants.

Lastly, Plaintiff complains that the Defendants essentially failed to "inquire[] into enough facts to make a professional judgment regarding the medical treatment." Dkt. [134] at 1, ¶ 2. We find that Plaintiff's complaint constitutes nothing other than an argument that the Defendants should have engaged in more or different testing than the tests that they did perform. Such is insufficient as a matter of law to state an Eighth Amendment claim. See, e.g., Estelle, 429 U.S. at 107 ("Respondent contends that more should have been done by way of diagnosis and treatment, and suggests a number of options that were not pursued. The Court of Appeals agreed, stating: 'Certainly an x-ray of (Gamble's) lower back might have been in order and other tests conducted that would have led to appropriate diagnosis and treatment for the daily pain and suffering he was experiencing.' 516 F.2d, at 941. But the question whether an X-ray or additional

13

diagnostic techniques or forms of treatment is indicated is a classic example of a matter for medical judgment. A medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment. At most it is medical malpractice. . . .")(some citations omitted); Jones v. Seay, 208 F.3d 213 (Table), 2000 WL 282940, at *1 (6th Cir. 2000)("Jones's belief that the defendants should have done more tests is merely a dispute over the adequacy of his treatment and does not constitute a constitutional claim."); Dulany v. Carnahan, 132 F.3d 1234, 1242 (8th Cir. 1997)("In any event, showing that another physician might have ordered different tests and treatment does not show deliberate indifference. ").

Accordingly, both real person Defendants are entitled to summary judgment.

Plaintiff also makes a claim of policy, practice or custom against Defendants PHS. In order for a defendant to be held liable under Section 1983 for a policy, practice or custom, a plaintiff must establish that the policy practice or custom caused the federal rights violation. See, e.g., Gonzaga University v. Doe, 536 U.S. 273, 296 (2002)(liability under Section 1983 is permitted where "'policy or custom' has caused the violation of an individual's federal rights"); Watson v. Abington Tp., 478 F.3d 144, 156 (3d Cir. 2007)("In addition to proving that an unlawful policy or custom existed, a plaintiff also bears the burden of proving that such a policy or custom was the proximate cause of the injuries suffered."). Given what we have found, i.e., that Plaintiff has failed to establish that he suffered a violation of his federal constitutional or statutory rights, then, *a fortiori*, he cannot show that any policy was the proximate cause of a non-existent constitutional or federal statutory violation. Accordingly, Defendant PHS is likewise entitled to summary judgment as to Plaintiff's Eighth Amendment deliberate

indifference claim.[6]

III. Conclusion

For the above stated reasons, it is recommended that the Defendants' Motion for Summary Judgment be granted.

In accordance with the Magistrates Act, 28 U.S.C. § 636(b)(1)(B) & (C), and Local Rule 72.1.4 B, the parties are permitted to file written objections and responses thereto in accordance with the schedule established in the docket entry reflecting the filing of this Report and Recommendation. Failure to timely file objections may constitute waiver of any appellate rights.

>Respectfully submitted,
>
>*/s/ Amy Reynolds Hay*
>United States Magistrate Judge

Dated: 28 May, 2009

cc: The Honorable Nora Barry Fischer
United States District Judge

---

[6] To the extent that any one of the grounds relied upon in this report to recommend the grant of summary judgment was not raised by the Defendants, the court has power to *sua sponte* grant summary judgment so long as the losing party has notice and an opportunity to be heard. Canell v. Bradshaw, 97 F.3d 1458 (Table), 1996 WL 547978 at **5 (9th Cir. 1996) (unpublished) ("A district court may grant summary judgment to a non-moving party *sua sponte* so long as the other party has had an adequate opportunity to address the relevant issues."). See also Celotex, 477 U.S. at 326 ("Our conclusion is bolstered by the fact that district courts are widely acknowledged to possess the power to enter summary judgments *sua sponte*, so long as the losing party was on notice that she had to come forward with all of her evidence."). This report and recommendation can serve as the necessary notice; and the opportunity to object, provides Plaintiff with the opportunity to present any further evidence he may have with respect to the dispositive issues. Magouirk v. Phillips, 144 F.3d 348, 359 (5th Cir. 1998) ("Here, the Magistrate Judge's Memorandum and Recommendation placed Magouirk on notice that procedural default was a potentially dispositive issue with respect to three of his claims. Magouirk responded to the Magistrate Judge's *sua sponte* invocation of procedural default within the ten-day time period allowed for filing objections to the report. Thus, Magouirk was afforded both notice and a reasonable opportunity to oppose application of the procedural default doctrine in the district court."); Canady v. Baker, 142 F.3d 432 (Table), 1998 WL 123996, at *1 (6th Cir. 1998)(same).

James E. McCoy
HG--2351
S.C.I. at Somerset
1600 Walters Mill Road
Somerset, PA 15510

All counsel of record by Notice of Electronic Filing